# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Essex Insurance Company,<br><br>        Plaintiff,<br><br>        v.<br><br>William Kramer & Associates, Inc.,<br><br>        Defendant. | No. 3:13-cv-1537 (MPS) |

## Memorandum and Order

This case requires me to decide whether a jury's finding that the applicable statute of limitations was tolled under Connecticut's "continuing course of conduct" doctrine is supported by sufficient evidence.  Essex Insurance Company ("Essex") asserts a negligence claim against independent adjuster William Kramer & Associates, LLC ("WKA"), arising out of Essex's employment of WKA in 2006 and 2007 to adjust losses to commercial properties in Florida caused by Hurricane Wilma.  Essex claims that WKA was negligent in failing to inform Essex, before it issued the final claim check for the loss, of the existence of a mortgagee on one of the properties.  The undisclosed mortgagee later sued Essex and received a large settlement.

The Court held a jury trial on February 10, 11, and 12, 2016.  The jury found Essex negligent and awarded damages of $1,250,002.89.  The jury also found that although Essex had brought suit more than three years after WKA's negligent conduct, the claim was not time-barred because WKA had engaged in a "continuing course of conduct" that tolled the applicable statute of limitations.

WKA has renewed its motion for judgment as a matter of law, arguing that no reasonable juror could find based on the evidence presented at trial that Connecticut's "continuing course of conduct" doctrine sufficiently tolled the statute of limitations to make Essex's claim timely.

After construing the evidence in the light most favorable to Essex and drawing all reasonable inferences in its favor, I agree with WKA and conclude that it is entitled to judgment as a matter of law.

### I.       Legal Standard

Fed. R. Civ. P. 50(a)(1)(B) states,

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim . . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue.[1]

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

> [T]he district court must [also] draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . Thus, although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations and internal quotation marks omitted).  "Although a party making a Rule 50 motion always faces a heavy

---

[1] Rule 50(b) governs "renewed" motions for judgment as a matter of law:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), a court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. . . . No later than 28 days after the entry of judgment . . . the movant may file a renewed motion . . . .  In ruling on the renewed motion, the court may . . . direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b)(3).  Essex moved for judgment as a matter of law under Rule 50(a) before the case was submitted to the jury, arguing that WKA's claim was time-barred.

burden, that burden is particularly heavy, where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Newton v. City of New York*, 779 F.3d 140, 146 (2d Cir. 2015).

## II.    Factual Background

Construing the evidence presented at trial in the light most favorable to Essex, and drawing all reasonable inferences in its favor, the jury could have found the following facts.

### A.  Essex Hires WKA to Adjust Losses to The Villas

In October of 2005, Hurricane Wilma damaged several properties in Florida, including a commercial property known as "The Villas." (Verna Test., ECF No. 79-3, at 6.) Before the storm, IDM, owner of The Villas and other properties in the area, obtained several layers of insurance to protect itself against loss. (*Id.* at 3.) IDM had an initial layer of $5 million in coverage from Aspen Insurance Company ("Aspen") and an excess layer of $10 million shared by Essex and a third insurance company. (*Id.* at 4.) After the storm, Essex received a Notice of Loss from IDM's retail agent, Brian Adams (an employee of insurance agency USI), indicating that the loss resulting from the damage to The Villas might reach Essex's layer of coverage. (*Id.* at 5.)

Aspen hired WKA to adjust the loss to the IDM properties for its initial layer of coverage. (*Id.*) Around that time, Dennis Martin, a WKA employee, contacted Essex and asked if WKA could also perform adjusting work for Essex should the loss reach Essex's excess layer. (*Id.*) It is customary for excess-layer insurers to engage the same independent adjuster as the initial layer insurer because all insurers can thereby share the information and work product already generated by the original adjuster, reducing the need for redundant work. (*Id.* at 6.) Richard Verna, an Essex employee, agreed to hire WKA as Essex's independent adjuster for the

IDM properties, which included The Villas.  (*Id.* at 5–6.)

On April 25, 2006, Adams sent WKA adjuster Robert Oberpriller a letter indicating there had been an issue with one of Aspen's payment checks.  (Pl.'s Ex. 2.)  Adams attached to his letter "a copy of the mortgagees" on each of the IDM properties.  (*Id*.)  The attached document, titled "IDM Management, Inc. /schedule of Mortgagees," listed Intervest National Bank ("Intervest") as a mortgagee on The Villas.  (*Id.*)  After receiving Adams's letter, Oberpriller sent a letter to Aspen employee Kevin Igoe, requesting that Aspen reissue the check referenced in Adams's letter.  (Pl.'s Ex. 3.)

### B.  WKA Performs Adjusting Work on The Villas

Upon hiring WKA, Essex (through Verna) requested that WKA perform a "full adjustment" on The Villas.  (Verna Test. at 12.)  A full adjustment includes inspecting the property, determining the scope of damage and estimating the loss, working with IDM to agree to an amount of loss, reviewing all coverage aspects of Essex's policy, identifying any potential coverage issues, and reporting all elements associated with the investigation and the claim measuring process.  (*Id.*)  It also includes identifying any mortgagees on the properties on which WKA was performing its work:

> Q:  Did WKA at the time it was adjusting the loss for Essex Insurance Company . . . have a duty to Essex to follow the instructions that was given to it by Essex regarding adjusting the loss?
>
> A:  Yes.
>
> Q:  And one of the things we've looked at a few times in this case is an assignment from Aspen, the first insurer that said identify the mortgagees, right?
>
> A:  Right.
>
> Q:  That was one of the duties in this case of William Kramer and Associates, wasn't it?

4

A: Right.

Q: And that duty wasn't just to Aspen, was it?

A: No, to all insurance companies.

Q: Including Essex, correct?

A: Correct.

(Martin Test. at 10.)  On multiple occasions while WKA was performing its adjusting work for

Essex, Verna asked Martin and/or Oberpriller whether there was a mortgagee on The Villas, and

the WKA employees responded in the negative:

Q: And did you specifically in 2006 ask WKA, in particular, Mr. Oberpriller or
Mr. Martin who was working on the file, to identify if there was a mortgagee
for [T]he Villas?

A: I did, yes.

Q: And do you recall receiving [this] email . . . from Mr. Oberpriller dated
August 28, 2006, in particular, in the second line where he indicates there is
no mortgage company for [T]he Villas?

A: Yes, sir, I recognize this.

Q: And at that period, was that the response you're receiving from WKA, that
there was not a mortgage company for [T]he Villas?

A: Yes.

(Verna Test. at 12–13.)

    While performing the adjusting work, WKA sent periodic status reports to Essex.  (*Id.* at

15–17.)  These reports included lists of the IDM properties as well as the name of any

mortgagees on those properties.  (*Id.*)  The lists identified a mortgagee on each IDM property

except The Villas, for which WKA indicated that there was "no mortgagee."  (*Id.* at 17–18.)

Each status report was signed by Oberpriller and Martin.  (*Id.* at 18.)  Had Oberpriller looked in

5

WKA's files regarding the work it had done for Aspen, he would have seen the schedule of mortgagees it received from Adams, which indicated that Intervest was a mortgagee on The Villas.  (Martin Test. at 3; *see also* Def.'s Ex. 51, at 152 ("Q: Would you agree with me, sir, that had you looked in WKA's file or had you looked at this in particular, this letter that was addressed to you . . . that you could have seen on the schedule of mortgagees . . . that The Villas did have a mortgagee? A: Yes.").)  Martin agreed that Essex, while WKA was performing its adjusting work, could "fairly rely" on the fact that WKA would share information about IDM properties WKA obtained while performing work for Aspen, including the schedule of mortgagees Adams sent to Oberpriller.  (Martin Test. at 7.)

In March 2007, before issuing Essex's final claim payment check for The Villas, Verna again asked Martin and Oberpriller if there was a mortgagee on The Villas.  (Verna Test. at 13.)  The WKA employees responded that they had not received a response from the policyholder as to whether a mortgagee interest existed on The Villas, but stated that there was no indication there was a mortgagee.  (*Id*.)  Verna assumed that when he inquired as to whether there was a mortgagee on The Villas, the WKA employees would look in their files to see if they had that information.  (*Id*. at 13–14.)  Verna never received any indication from WKA in 2007 that The Villas had a mortgage.  (*Id*. at 21.)  Because Verna was not a licensed insurance adjuster in the State of Florida, he lacked authority to contact IDM or its representatives directly.  (*Id*.)  Essex issued the final claim payment check on March 19, 2007; it did not list Intervest as a payee. (Def.'s Ex. 515.)  Had Verna known about Intervest's interest in The Villas, he would have included Intervest on the payment check or reached out to Intervest to "let them know that we had been apprised that they had an interest" and that Essex was going to make its final claim payment.  (Verna Test. at 25.)  Because WKA failed to inform Essex about Intervest's interest,

Verna was not in a position to initiate any such discussion with Intervest or IDM.  (*Id.* at 26;

Martin Test. at 26.)

### C.  WKA's Post-March 2007 Relationship with Essex

Essex and WKA never executed a written contract regarding WKA's adjusting work on

the IDM properties.  Once Essex issued its final payment check to IDM, Verna ceased "tracking

what was going on" with the IDM properties.  (Verna Test. at 30.)  WKA, however, still

considered Essex its "client" after finishing its adjusting work on the IDM properties, and

continues to do so "[e]ven to this day."  (Martin Test. at 25.)  In August or September of 2007,

Martin contacted Essex to inform it that AXIS Insurance Company ("AXIS"), which held the

final excess layer of coverage on the IDM properties, had contacted WKA and asked how Essex

had made its payment checks payable.  (Verna Test. at 28.)  In addition, when WKA was

subpoenaed in 2009 and when Martin was required to testify at a deposition in 2012 in

connection with a lawsuit Intervest had initiated regarding the IDM properties (the "Intervest

Action") – which is discussed in greater detail below – WKA billed Essex for the costs it

incurred.  At trial, Mr. Martin of WKA testified as follows:

> Q:  But you do remember that at each time that you -- WKA was contacted about
> [T]he Villas or IDM after March '07, you would reach out to Essex on each of
> those occasions, wouldn't you?
>
> A:  I can't say, sir, each occasion.
>
> Q:  Well, I've shown you at least two[, the 2009 subpoena and the 2012
> deposition], right?
>
> A:  Yes.
>
> Q:  And you would use their attorneys, right?
>
> A:  Right.
>
> Q:  And you would bill them for the services they provided you, right?

A:  Usually, yes.

(*Id.* at 24–25.)  This was because WKA and Essex had on "ongoing relationship" with Essex

with regard to The Villas, even after 2007:

> Q:  And you still had that relationship with Essex regarding IDM and [T]he Villas
> loss even up until the time of 2012, at the time you were billing them for
> services, correct?
>
> A:  Right.
>
> . . .
>
> Q:  You're still treating them like your client, right?
>
> A:  Yes.
>
> Q:  Because you had an ongoing relationship with them, didn't you?
>
> A:  Sure.  Even to this day.

(*Id.* at 19, 25.)

### D.  The Intervest Action

As noted, in 2009, WKA received a subpoena in connection with the Intervest Action.

The subpoena requested that WKA produce any files in its possession relating to the IDM

properties.  (*Id*. at 29.)  Martin contacted Verna after receiving the subpoena because "if an issue

came up regarding [T]he Villas and [Essex], [WKA] had an obligation to tell" Essex.  (Martin

Test. at 17.)  In response, Verna informed WKA that Essex would cover WKA's expenses

related to the Intervest Action.

> Q:  And after [2007], do you recall anything else happening with regard to the
> IDM or [T]he Villas adjustment?
>
> A:  Yes. In 2009, as I recall, there was contact from WKA, again indicating that
> there had been a subpoena to furnish their file materials concerning the IDM
> adjustment, and sought my input relative to the process associated with
> answering that subpoena.

> Q:  How did Essex respond to that?
>
> A:  I advised Mr. Martin that [Essex] would assist with WKA's responsibility to produce their file and asked Attorney Janet Brown who had assisted [Verna] in the loss adjustment process to again open her file and assist us with the . . . document production. . . . [Essex also] kept a claim file open and ongoing and we continued to incur expenses associated with the subpoena and production process on behalf of WKA and Essex Insurance Company.

(Verna Test. at 28–29.)

In responding to the 2009 subpoena, WKA failed to produce a file located at its Tampa Bay office, which included documents WKA had collected while performing work for Aspen on The Villas adjustment.  (*Id.*; Martin Test. at 14–15; Pl.'s Ex. 52.)  That file, referred to by the parties at trial as the "Aspen File," included the schedule of mortgagees sent by Adams to Oberpriller and Martin, which indicated Intervest's mortgagee interest in The Villas.  (Verna Test. at 29; Martin Test. at 14; Pl.'s Ex. 52.)  In 2011, Intervest amended its complaint and added Essex as a co-defendant in the Intervest Action.  (Verna Test. at 29–30; Pl.'s Ex. 49.)  This forced Essex to retain counsel and incur legal expenses.  (Verna Test. at 32–33.)[2]  Verna was deposed in connection with the Intervest Action, during which he denied having any knowledge of Intervest's mortgagee interest in The Villas.  (*Id.* at 34.)

As noted, Martin was also deposed in the Intervest Action on September 5, 2012.  (*Id.*) As with the 2009 subpoena, WKA contacted Essex after receiving the deposition notice:

> Q:  And you got the [2009] subpoena.  So you [contacted Essex to inform it that] this involves [T]he Villas, correct?
>
> A:  Right.
>
> . . .
>
> Q:  And that was because . . . although the last . . . payment check had been

---

[2] The jury's verdict of $1,250,002.89 included legal fees incurred by Essex in the amount of $250,002.89. (ECF No. 69 at 2.)

issued, if an issue came up regarding [T]he Villas and your client, you had an
obligation to tell them, didn't you?

A:  Sure.

Q:  And that was just – that was an obligation [that you] complied with, right?

A:  Yes.

Q:  And in fact, even in 2012, when you were going to be deposed, at that point
you reached out to them again, right?

A:  I think we did, yes.

(Martin Test. at 15–17.)  Essex's attorney, Janet Brown, attended Martin's deposition, and WKA

billed Essex for the time Martin spent at his deposition:

Q:  . . . Their attorney was with you at the deposition, right?

A:  Right.

. . .

Q:  [I]s it accurate, sir, that you billed Essex for the time that you spent in your
deposition?

A:  Well, we billed them . . . $3,000, but then we only got a check for [$1,]968.

. . .

Q:  . . . You did bill them, right, regardless of the amounts?

A:  Yes.

Q:  And you billed them because at the time this issue still involved [T]he Villas
property and the IDM loss, correct?

A:  Yes.

(*Id*. at 18–19.)  In preparing for his deposition, Martin "searched the office again, just to be

diligent," and came upon the Aspen File.[3]  (*Id.* at 15–16.)  Martin, for the first time, produced the

---

[3] There was no evidence presented at trial that, in connection with Martin's deposition, WKA received a
subpoena duces tecum, i.e., a subpoena seeking documents in addition to Martin's testimony.  It is

Aspen File to Interest and Essex.  (*Id.*; Verna Test. at 34.)  This was the first time Verna had

seen the schedule of mortgagees indicating Interest's interest in The Villas.  (Verna Test. at 34–

35.)

>  After the revelation that WKA's files contained a document indicating Interest's

mortgagee interest in The Villas, Essex reevaluated its strategy in the Interest Action.  Essex

feared that WKA's constructive knowledge that Interest was a mortgagee on The Villas would

be imputed to Essex, leaving Essex liable for its failure to include Interest on the claim payment

check or at least to communicate with Interest before it paid the claim on The Villas:

> Q:  [WKA's discovery of the Aspen File] wasn't a small matter . . . because you were
> [Essex's] agent and [WKA's] knowledge was going to be imputed to [Essex], isn't
> that right?

> A:  Right.

(Martin Test. at 13; *see also* Verna Test. at 37 ("The evaluation generated a position or a feeling

that Essex Insurance Company was now . . . exposed to the fact that it was on notice of the

Interest interest in [T]he Villas property because our agent, WKA, had that information in their

file.").)  As a result, Essex settled with Interest by paying it one million dollars.  (*Id.* at 37–38.)

By the conclusion of the Interest Action, Essex had incurred a total of $250,002.89 in attorneys'

fees and costs.  (*Id.* at 40; *see* note 2, *supra*.)

> ### E.  The Jury's Verdict

>  With respect to the law at issue in WKA's Rule 50 motion – namely, the statute of

limitations and tolling doctrines applicable to Essex's negligence claim – the Court instructed the

jury as follows:

>  The statute of limitations that applies to Essex's claim of negligence requires that

---

reasonable, however, to infer that, because Martin was required to attend a deposition and did in fact
conduct another document search, the subpoena did include a document demand and thus that WKA was
required in 2012 to produce documents in its possession related to its IDM adjustment work.

the claim be brought within three years of the date on which the negligent conduct occurred. . . .  The time period for bringing such suit begins to run at the time of the act or occurrence, not at the time the plaintiff discovers it.

I instruct you that Essex brought its suit against WKA in this Court on October 21, 2013.[4] . . .

The law recognizes that there are some situations in which the period set in a statute of limitations does not apply, or in which the date when the period begins to run is suspended or delayed.  These situations are referred to as "tolling" the statute of limitations.  The time specified for bringing suit does not run during a time when the statute of limitations is tolled.

Essex has alleged that a tolling doctrine known as the "continuing course of conduct" applies in this action, and that the statute of limitations therefore does not bar Essex's claim in the way that WKA asserts.  Essex has the burden of proving, by a preponderance of the evidence, that the statute of limitation is tolled as a result of a continuing course of conduct.

In order to find a continuing course of conduct, there must be evidence of a breach of a duty that remained in existence after the commission of the original wrong related thereto.  To establish such a duty, Essex must prove either a "special relationship" between Essex and WKA giving rise to such a continuing duty, or some later wrongful conduct committed by WKA related to the original wrong.

**Special Relationship**

I instruct you that, as an adjuster hired by Essex, WKA was Essex's agent and therefore had a special relationship of trust with Essex.  You must determine whether that relationship of trust continued such that WKA owed a duty of care to Essex that continued past the date of the incident on which the negligence claim is based.

The fact that a plaintiff may have had a special relationship with a defendant at one point in time does not necessarily establish that there was an ongoing relationship.  It may be that the parties had a special relationship that ended, or that there was a series of times or transactions when WKA had a special relationship with Essex that was not continuous but ended with the completion of each transaction.  If WKA's special relationship with Essex required it to notify Essex of any entity that had a mortgage on The Villas, then a claim is not barred by the statute of limitation if Essex brought suit within three years of the last date on which that special relationship existed.

**Subsequent Wrongful Act**

---

[4] Although the docket reflects that the complaint was not filed until October 22, 2013, the case was opened on October 21, 2013, and the Court used this earlier date in the jury instructions without objection from either party.

The second way in which Essex may establish a breach of a continuing duty is to prove that WKA engaged in some later wrongful conduct related to the original wrong.  Such later wrongful conduct may include acts of omission as well as affirmative acts of misconduct.

. . .

Even where there is a continuing course of conduct, Essex's claim is barred if it failed to bring its claim within three years of the end of that course of conduct.

(Court's Jury Instructions, ECF No. 64, at 21–22.)

On the verdict form, the jury indicated that "WKA proved . . . that Essex filed this lawsuit more than three years after the act(s) or occurrence(s) on which [the] lawsuit is based," but that "WKA engaged in a continuing course of conduct such that WKA's duty to Essex continued in a manner that tolled the statute of limitations for enough time that Essex's claim is not time-barred."  (Jury Verdict Form, ECF No. 69, at 1–2 (Questions B.1 and C.1).)

## III. Discussion

In its renewed Rule 50 motion, WKA argues that Essex's negligence claim is time-barred because Essex filed this suit more than three years after WKA's purported negligence.[5]  WKA contends that no reasonable jury could find that the "continuing course of conduct" doctrine applies under the facts of this case because (1) any special relationship that existed as a result of WKA's adjustment work on The Villas on behalf of Essex did not continue after WKA completed its work in March 2007, and (2) WKA did not engage in any later related wrongful conduct that occurred within three years of Essex's bringing this suit.  I agree that no reasonable jury could find, based on the evidence presented at trial, that the continuing course of conduct doctrine renders Essex's claim timely.

---

[5] As explained below, the applicable statute of limitations is Conn. Gen. Stat. § 52-577, which provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

13

### A.  Statute of Limitations Applicable to Essex's Claim

#### 1.  Choice of Law Analyses

Because much of the conduct at issue in this case occurred in Florida, while WKA's offices are located in Connecticut, it is necessary to begin by deciding which law applies to the tolling issues presented here.  The steps in determining which State's statute of limitation applies to Essex's claim proceed as follows:

> As interpreted by the Supreme Court, the Rules of Decision Act provides that federal courts exercising diversity jurisdiction over a state-law claim must consider two conceptually distinct issues.  First, a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court.  Though constrained in some respects by the United States Constitution, this choice-of-law inquiry is an issue of *state* law.  Second, after using state conflict-of-laws principles to ascertain the rules of decision that would apply in the state courts of the federal forum, federal courts apply those state rules of decision that are "substantive" under *Erie*, and are consistent with federal law.

*Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151–53 (2d Cir. 2013) (citations and internal quotations omitted) (emphasis in original).

Thus, the first inquiry is whether, under Connecticut choice-of-law rules, Connecticut or Florida law supplies the statute of limitations applicable to Essex's claim.  Connecticut choice-of-law rules instruct that, regardless of the source of the substantive law governing a state law claim, the appropriate Connecticut statute of limitation applies to the claim if that statute of limitations is "procedural."[6] *Baxter v. Sturm, Ruger and Co., Inc.*, 230 Conn. 335, 339–40

---

[6] This label should not be confused with the *Erie* doctrine's "procedural-substantive" dichotomy, which is addressed below.  In fact, the *Liberty Synergistics* court highlighted this opportunity for confusion:

> Classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor, but perhaps even more confounding is the fact that a state's 'procedural' rules under its own choice-of-law principles can be 'substantive' for purpose of *federal* diversity jurisdiction.  For instance, a state court considering whether to apply its own statutes of limitations to claims governed by the laws of other states, may apply

(*cont.*)

(1994).  A statute of limitations is "procedural" for purposes of Connecticut choice-of-law rules when it limits a cause of action that existed at common law:

> Under our law, proper characterization of a statute of limitation . . . requires a determination of whether the limitation is directed at the cause of action so specifically as to warrant saying that it qualifies the right.  If so, the limitation is characterized as substantive, and the lex loci applies.  Otherwise, the limitation merely qualifies the remedy rather than the right[;] it is characterized as procedural, and the lex fori applies.
>
> A limitation period is considered one of the congeries of elements necessary to establish the right, and therefore characterized as substantive, only when it applies to a new right created by statute.  . . . [F]or the limitation period of the lex loci to apply, the underlying right upon which the lawsuit is based must not have existed at common law.  Otherwise, the limitations period established by the lex fori governs.

*Id.* at 340 (citations and internal quotation marks omitted).  Negligence is a claim that existed at common law.  Thus, the Connecticut statute of limitations applicable to the professional negligence claim involved in this case – Conn. Gen. Stat. § 52-577[7] – limits Essex's claim against WKA, regardless of the source of substantive law governing the claim.

The second inquiry is whether Conn. Gen. Stat. § 52-577 is, for purposes of the doctrine set forth in *Erie R .Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny, "procedural" or "substantive."  If it is substantive, the Court must apply the law; if procedural, it need not.  A substantive state law is one that "significantly affect[s] the result" of the litigation, and would be "controlling in an action upon the same claim by the same parties in a State court."  *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945).  In other words, a state law is substantive if it is

---

(*cont.*)
> its statutes of limitations as a 'procedural' matter.

718 F.3d at 153.

[7] A different statute of limitations – Conn. Gen. Stat. § 52-584 – governs negligence claims asserting personal injury or damage to property.

outcome-determinative.  Conn. Gen. Stat. § 52-577, a statute of limitations, is outcome-determinative because its operation would prohibit Essex from recovering against WKA, and is thus "substantive" under *Erie*.  *See, e.g.*, *Jinks v. Richland Cty., S.C.*, 538 U.S. 456, 465 (2003) ("For purposes of *Erie*[,] for example, statutes of limitations are treated as substantive."); *Giovanniello v. ALM Media, LLC*, 660 F.3d 587, 593 (2d Cir. 2011) ("[F]ederal courts adjudicating state causes of action pursuant to diversity jurisdiction must apply outcome-determinative state statutes of limitations.") *vacated and remanded on other grounds*, 133 S. Ct. 159 (2012).  As a result, Conn. Gen. Stat. § 52-577 applies to Essex's negligence claim.

### 2.  Conn. Gen. Stat. § 52-577

Conn. Gen. Stat. § 52-577 states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  Section 52-577 is a statute of repose: it begins to run on the date of the wrongful act or omission regardless of whether the plaintiff is aware of the misconduct or incurs damages.  *See, e.g.*, *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 211 (1988) ("[T]he history of [Section 52-577] . . . precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."); *Sanborn v. Greenwald*, 39 Conn. App. 289, 302 (1995) ("Section 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues.").

### B.  Continuing Course of Conduct

Essex filed its complaint in this Court on October 21, 2013.  Thus, for this action to be timely, WKA's negligent conduct must have occurred no earlier than October 21, 2010.  The initial negligent conduct asserted in this case – WKA's failure to inform Essex that Intervest was a mortgagee on The Villas – occurred before Essex issued its final claim payment check to IDM

on March 19, 2007.  This action therefore was filed more than three years after the "date of the

act or omission complained of."

Essex contends, however, that WKA engaged in a "continuing course of conduct" that

tolled the limitations period such that it did not begin to run until WKA finally produced the

Aspen File in 2012.  The Connecticut Supreme Court has described the continuing course of

conduct doctrine as follows:

> In order to prove a continuing course of conduct, a plaintiff must bring
> evidence of the breach of a duty that remained in existence after commission of
> the original wrong related thereto. . . . Where [Connecticut courts] have upheld a
> finding that a duty continued to exist after the cessation of the act or omission
> relied upon, there has been evidence of either a special relationship between the
> parties giving rise to such a continuing duty or some later wrongful conduct of a
> defendant related to the prior act. . . . Such later wrongful conduct may include
> acts of omission as well as affirmative acts of misconduct.
>
> In sum, . . . [a plaintiff must show] the defendant: (1) committed an initial wrong
> upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to
> the alleged original wrong; and (3) continually breached that duty.

*Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 312–13 (2014) (citations and internal

quotation marks omitted).  "The continuing course of conduct doctrine reflects the policy that,

during an ongoing relationship, lawsuits are premature because specific tortious acts or

omissions may be difficult to identify and may yet be remedied.  For example, the doctrine is

generally applicable under circumstances . . . where the negligence consists of a series of acts or

omissions and it is appropriate to allow the course of action to terminate before allowing the

repose section of the statute of limitations to run."  *Sanborn*, 39 Conn. App. at 295–96 (citations,

internal quotation marks, and alterations omitted).  "Furthermore, the doctrine of continuing

course of conduct as used to toll a statute of limitations is better suited to claims where the

situation keeps evolving after the act complained of is complete."  *Macellaio v. Newington*

*Police Dep't*, 145 Conn. App. 426, 435 (2013) (internal quotation marks and alterations omitted).

17

At the outset, I note that the continuing course of conduct doctrine, under Connecticut law, is neither well-developed nor easily deciphered.  Courts tend to use open-ended language when identifying the fundamental elements of the doctrine, such as "later wrongful conduct . . . related to the prior act."  And outside the context of physician-patient and attorney-client interactions, the case law provides little guidance on the limits of tolling when applied to "special relationships."  Nonetheless, I tailor my analysis as closely as possible to the most analogous case law available from the Connecticut courts.

Based on the evidence presented at trial, a reasonable juror could conclude that WKA's initial failure to inform Essex of Intervest's interest in The Villas constituted negligence and, in the language of the continuing course of doctrine, an "initial wrong."  Thus, to survive WKA's motion, Essex must have also presented evidence permitting a reasonable jury to conclude (1) that a special relationship existed between WKA and Essex that required WKA to inform Essex of the existence of a mortgagee on The Villas and that began no later than March 19, 2007 (the date on which Essex made its final claim payment and by which WKA's adjustment work on The Villas was complete), and lasted through October 21, 2010, or (2) that WKA engaged in later wrongful conduct after October 20, 2010, that was related to its initial negligence in failing to inform Essex of Intervest's interest.  For the reasons explained below, I conclude that no reasonable jury could find that the parties' special relationship included a duty on the part of WKA to notify Essex of the contents of its files that continued through October 21, 2010, or that WKA engaged in later wrongful conduct related to its 2007 omission on or after October 21, 2010.

## 1.  Special Relationship

The determination of whether a special relationship exists depends on the "circumstances

that exist between the parties and the nature of the claim at issue":

> [o]ur appellate courts have not defined precisely what constitutes a special
> relationship for purposes of tolling . . . .  Usually, such a special relationship is
> one that is built upon a fiduciary or otherwise confidential foundation.  A
> fiduciary or confidential relationship is characterized by a unique degree of trust
> and confidence between the parties, one of whom has superior knowledge, skill or
> expertise and is under a duty to represent the interests of the other. . . . Fiduciaries
> appear in a variety of forms, including agents, partners, lawyers, directors,
> trustees, executors, receivers, bailees and guardians.

*Saint Bernard Sch. of Montville, Inc. v. Bank of America*, 312 Conn. 811, 835 (2014) (citations

and internal quotation marks omitted).  A simple contractual relationship does not form a special

relationship.  *See Fichera*, 207 Conn. at 210 ("[A] contractual relationship . . . does not create a

fiduciary obligation that might have imposed upon the defendants as the perpetrators of a fraud

the continuing duty to disclose their prior lack of candor to the plaintiffs.").

    At the trial, I instructed the jury that "as an adjuster hired by Essex, WKA was Essex's

agent and therefore had a special relationship of trust with Essex."  (ECF No. 64 at 21.)[8]  The

central question is whether that special relationship extended beyond the time WKA completed

its adjusting work on The Villas and through October 21, 2010.  Case law suggests that it did

not.  In *Flannery*, for example, the special relationship at issue was an attorney-client

relationship: the plaintiff had hired an attorney after winning a lottery award, and the attorney

referred the plaintiff to a company seeking to purchase the plaintiff's installment payments in

exchange for a lump sum.  In doing so, the attorney breached his fiduciary duty of loyalty to the

plaintiff because the attorney had an existing business relationship with the company and failed

---

[8] WKA objected to this instruction, but I found it to be supported by Connecticut case law.   *See Beck v. Utica Mut. Ins. Co.*, No. CV-11-6022761, 2013 WL 3388880, at *5 (Conn. Super. Ct. June 18, 2013) ("The law of agency requires a duty of absolute loyalty of the adjuster to its employer, the insurer . . ."); *Grossman v. Homesite Ins. Co.*, No. FSTCV-07-5004413-S, 2009 WL 2357978, at *3 (Conn. Super. Ct. July 6, 2009) (same); *Taylor v. Hamden Hall Sch., Inc.*, 149 Conn. 545, 552 (1962) ("An agent is a fiduciary with respect to matters within the scope of his agency.").

to disclose that conflict of interest to the plaintiff.  By the time the plaintiff brought suit, however, nearly five years had passed since the attorney had sent the plaintiff his final bill.[9] When the defendant asserted that the plaintiff's claim was barred by the applicable three-year statute of limitations, the plaintiff invoked the continuing course of conduct doctrine by arguing, in part, that a special relationship continued between the parties that obligated the attorney to disclose the conflict of interest even after he no longer represented the plaintiff.

The court held that the special relationship between the plaintiff and the attorney terminated the day the attorney sent the plaintiff his final bill in 1999, and that neither the plaintiff's later communication with the attorney in 2002 nor the attorney's subsequent referral of the plaintiff to another attorney affected that termination date:

> [a]s to the existence of a special relationship, there is no question that [the attorney], during the period of time he acted as plaintiff's attorney, had fiduciary responsibilities and an associated duty of loyalty towards the plaintiff.  Pursuant to the clear terms of the retainer agreement governing the relationship,[10] however, [the attorney's] brief representation of the plaintiff was completed and the plaintiff received his final bill for services rendered, in September, 1999. . . . Once that representation ceased, any remaining duties [the attorney] owed to the plaintiff as a former client were limited and did not include, as the plaintiff contends, an indefinite duty to inform him of the prior conflict of interest that no longer existed.

*Id.* at 317–18 (citations omitted).  Having concluded that the special relationship ended in 1999,

---

[9] The relevant dates were as follows.  The plaintiff closed the lottery transaction with the company on June 24, 1999.  The attorney sent the plaintiff a final bill on September 15, 1999.  After the plaintiff received a notice from the IRS that he would not get the tax benefits the attorney promised, the plaintiff contacted the attorney in October of 2002; the attorney maintained the correctness of his tax advice, and referred the plaintiff to a Florida attorney who was challenging the IRS's decision on behalf of similarly-situated lottery winners.  (The case proved unsuccessful.)  The plaintiff brought suit on July 22, 2005.  *Id.* at 292–95.  At no time did the attorney disclose his business relationship with the company to the plaintiff.  *Id.* at 294.

[10] The retainer agreement stated: "the attorney-client relationship will be considered terminated upon our completion of any services that you have retained us to perform," and "[u]nless you actually engage us after the closing to provide additional advice on issues arising from this representation, we have no continuing obligation to advise you with respect to future legal developments."  *Id.* at 292 n.9.

the court ruled that the relationship could not save the plaintiff's claim because it no longer existed during the three-year period prior to plaintiff's bringing his suit. *Id.* at 318. *See also Sanborn*, 39 Conn. App. at 297 ("The defendant's professional representation had ended and the statements that the defendant made to the plaintiff's new attorney neither created nor perpetuated any duty to the plaintiff."); *Carson v. Allianz Life Ins. Co. of N.A.*, No. HHD-CV-12-6030681-S, 2015 WL 6144107, at *5 (Conn. Super. Ct. Sept. 17, 2015) (granting summary judgment over plaintiff's assertion of the continuing course of conduct doctrine because, "[e]ven assuming . . . [defendant's agent] did have a fiduciary relationship with the plaintiff in a professional capacity, that relationship ended" more than three years before plaintiff brought suit).

To be sure, *Flannery* is not on all fours with this case. First, unlike in this case, the parties in *Flannery* had a written retainer agreement that spelled out a clear termination point for their relationship. (*See* note 10, *supra*.) Second, *Flannery* involved a breach of the duty of loyalty, in which the attorney actually knew about his wrongful failure to disclose while the relationship existed, whereas this case involves a breach of the duty of care, in which WKA did not actually know of its omission until Martin discovered the Aspen File in 2012.

Connecticut cases involving medical malpractice provide a somewhat closer factual analogy to WKA's situation. There, Connecticut courts have held that a physician's duty to correct a mistake extends beyond the termination of the physician's actual treatment only when the physician is actually aware, or had reason to know, of the mistake. *See, e.g.*, *Grey v. Stamford Health Sys., Inc.*, 282 Conn. 745, 756 (2007) ("[U]nder the continuing course of conduct doctrine, if the defendant *had reason to know* that the plaintiff required ongoing treatment or monitoring for a particular condition, then the defendant may have had a continuing duty to warn the plaintiff or to monitor the condition and the continuing breach of that duty tolls

the statute of limitations, regardless of whether the plaintiff had knowledge of any reason to seek further treatment." (emphasis added)).

Connecticut courts have noted that a special relationship might extend beyond the point in which the fiduciary concludes its relevant work if the fiduciary engages in affirmative conduct signaling that it still owed a duty of care, such as promising that if any later issues arise from the work it performed, the fiduciary will resolve the issue.  *See, e.g.*, *Sanborn*, 39 Conn. App. at 297 (holding that there was no extended special relationship because "[t]he defendant here did not engage in any affirmative conduct initiated by him after 1985, made no promise after the initial drafting of the stipulation that he would do something else in the future, . . . and committed no fraud"); *Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 162 (2002) ("In determining whether there was a special relationship [within the limitations period], we evaluate whether [Attorney] Levy initiated and engaged in any affirmative conduct after the initial wrong, which includes making promises after the initial wrong or promises to do anything additional in the future . . ."); *see also Pike Co., Inc. v. South Cent. Conn. Reg'l Auth.*, No. 3:08-CV-1751 (MRK), 2011 WL 1467756, at *7 (D. Conn. Apr. 18, 2011) ("As the Connecticut Appellate Court explained in [*Rosenfield*], the types of affirmative conduct by a defendant that can give rise to a special relationship with a plaintiff include making promises after [an] initial wrong or promises to do anything in the future . . . [and] fraud." (internal quotation marks omitted)).  No evidence was submitted at trial suggesting that WKA engaged in any such affirmative conduct that would have extended the relationship beyond March 2007.

Nor was any evidence submitted at trial that WKA's adjustment work for Essex on The Villas continued after Essex sent the claim payment in March 2007.  *Cf. Giulietti v. Giulietti*, 65 Conn. App. 813, 835 (2001) (holding the special relationship between the defendant attorney and

22

his clients sufficiently tolled the statute of limitations when the attorney continued to provide

legal services to those clients related to the same matters and made subsequent "wrongful

omissions relating back to the prior wrongful acts so as to trigger the [continuing course of

conduct] doctrine").  To the contrary, Verna admitted he stopped "tracking what was going on"

with the IDM properties after March 2007.  (Verna Test. at 30.)  Further, although the parties did

not enter into a written agreement setting forth a discrete moment at which their relationship

would terminate as in *Flannery*, no reasonable jury could find that WKA's duties of "full

adjustment" of The Villas continued after March 2007.

Essex cites two pieces of evidence in support of its argument that it had an extended

special relationship with WKA.[11]  First, Essex cites Verna's testimony that Martin contacted

Essex in 2007 to inform Essex that WKA received an inquiry from AXIS regarding how Essex

made its claim payment checks payable.  No reasonable jury could find that this evidence proved

an extended special relationship.  Subsequent communication between parties alone does not

extend a special relationship: as the court held in *Flannery*, even the attorney's second referral of

the plaintiff to the Florida attorney did not extend their special relationship beyond the date on

which the attorney sent the plaintiff his final bill.  312 Conn. at 317–18.  And even if WKA's

contacting Essex extended the fiduciary relationship into the end of 2007, this incident occurred

more than three years prior to Essex bringing this suit.

Second, Essex points to evidence regarding WKA's responses to the discovery inquiries

arising from the Intervest Action, i.e., WKA's response to the 2009 subpoena and Martin's 2012

deposition.  The evidence presented at trial undoubtedly proved some type of relationship

---

[11] I use the term "extended special relationship" as shorthand for a special relationship between Essex and WKA that obligated WKA to inform Essex of any mortgagee on The Villas, and that continued beyond March 19, 2007, the date on which Essex issued the final claim payment check.

between the parties during this period: WKA contacted Essex upon receiving the subpoena (Martin Test. at 15–17), billed Essex for its expenses resulting from the Intervest Action (*id.* at 19), and Martin stated that the parties maintain a relationship "even to this day" and that WKA still views Essex as its "client" (*id.* at 25). The crucial inquiry, however, is whether this evidence is sufficient to support a reasonable jury's finding that an extended special relationship existed between WKA and Essex that continued through October 21, 2010. It is not.

First, the fact that WKA had a limited duty to Essex beyond March 19, 2007, to keep Essex informed of subsequent events regarding The Villas (*see, e.g.*, Martin Test. at 17 ("Q: [I]f an issue came up regarding [T]he Villas and your client [Essex], you had obligation to tell them [Essex], didn't you? A: Sure. Q: And that was . . . an obligation that you complied with, right? A: Yes. Q: And, in fact, even in 2012,when you were going to be deposed, at that point you reached out to them again, right? A: I think we did, yes.")) does not prove that WKA was indefinitely bound to recheck its files to ensure that its earlier statement that there was no mortgagee interest on The Villas was indeed correct. *See Flannery*, 312 Conn. at 318 ("Once [the attorney's] representation ceased, any remaining duties [the attorney] owed to the plaintiff as a former client were limited and did not include, as the plaintiff contends, an indefinite duty to inform him of the prior conflict of interest that no longer existed."); *Blanchette v. Barrett*, 229 Conn. 256, 284 (1994) ("[W]e disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis in the absence of proof that he subsequently learned that his diagnosis was incorrect. . . . To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis.") *overruled on other grounds by Grey*, 282 Conn. at 839–40. The fact that WKA had a limited ongoing duty to advise Essex if, in the future, it learned

something new about The Villas is not the same as an ongoing duty to correct prior wrongful conduct of which it was not aware.

Second, WKA's billing of Essex for expenses incurred in responding to the 2009 and 2012 subpoenas (and Martin's deposition) does not mean that the duty of care WKA owed to Essex while performing adjusting work extended beyond March 2007. When the evidence is viewed in the light most favorable to Essex, a reasonable jury could infer – based on the fact that Essex paid WKA to produce information in response to the subpoenas – that WKA acted in some form as Essex's "agent" when it did so, and as a result, owed Essex a duty of care as its fiduciary at that time. That is, a reasonable juror could infer that WKA owed Essex a duty of care in responding to the subpoenas. (Surely, Essex was not compensating WKA to respond *negligently* to the subpoenas.) That does not mean, however, that receiving and responding to the subpoenas continued WKA's *original* duty of care in adjusting The Villas. In other words, receipt of the subpoenas in 2009 and 2012 did not extend or revive the "special relationship" that related to the adjustment of The Villas. *See, e.g.*, *Saint Bernard Sch.*, 312 Conn. at 835 ("Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a *continuing duty* or [later wrongful conduct]." (emphasis added)). At least under these circumstances, the extension of a special relationship between two parties cannot depend on later unrelated acts by third parties, such as the service of a subpoena by Intervest.

Finally, Martin's testimony that WKA continued to view Essex as a "client" after 2007 does not prove an extended special relationship. A jury could reasonably infer from that testimony that WKA expected Essex to rehire WKA for future adjustment work or that WKA was, at that moment, performing adjustment work for Essex on other properties. But even these

25

inferences do not suggest that WKA's duty of care with respect to the adjustment concerning *The Villas* continued after 2007, because a fiduciary's duty extends only to the "scope of [its] agency." *Taylor*, 149 Conn. at 552.  Because WKA was not Essex's agent with respect to the adjustment of The Villas after 2007, it was no longer required to advise Essex of the content of its files concerning The Villas.

Again, medical malpractice case law provides a helpful analogy.  Connecticut courts have fashioned a "continuous treatment doctrine," which tolls the statute of limitations on a malpractice claim against a treating physician while that physician continues to treat that patient. *Grey*, 282 Conn. at 751 ("When . . . the injurious consequences arise from a course of treatment, the statute does not begin to run until the treatment is terminated . . . . So long as the relation of physician and patient continues as to the particular injury or malady which [the physician] is employed to cure, and that physician continues to attend and examine the patient in relation thereto, and there is something more to be done by the physician in order to effect a cure, it cannot be said that the treatment has ceased.").  But even under that doctrine, the statute of limitations is tolled only while the physician continues to treat "*the particular injury or malady*." *Id.* (emphasis added); *see also id.* at 754 (identifying one of the elements of the continuous treatment doctrine as including "that the defendant provided ongoing treatment or monitoring of *that medical condition* after the allegedly negligent conduct, or that the plaintiff reasonably could have anticipated that the defendant would do so." (emphasis added)).  It follows from these statements that should the physician cease treating the patient for the injury at issue, the statute of limitations begins to run regardless of whether the physician has completely ceased all contact with the patient.  *See, e.g.*, *Blanchette*, 229 Conn. at 274–75 ("[T]here [need not] be a formal discharge of the physician or any formal termination of his [or her] employment.  If there is

nothing more to be done by the physician *as to the particular injury or malady which he [or she] was employed to treat* or if he [or she] ceases to attend the patient therefor, the treatment ordinarily ceases without any formality." (emphasis added)) *overruled on other grounds by Grey*, 282 Conn. at 757.  Similarly, for the statute of limitations to begin to run on Essex's negligence claim against WKA with respect to the adjustment of The Villas, WKA need not have terminated performing any and all work for Essex, but rather only its adjustment work pertaining to The Villas.

Viewing the evidence presented at trial in the light most favorable to Essex and drawing all reasonable inferences in its favor, no reasonable jury could conclude that the special relationship between the parties that existed as a result of WKA's performance of adjustment work on The Villas continued after March 2007.  As a result, the "special relationship" branch of the continuing course of conduct doctrine cannot save Essex's claim.

### 2.  Later Wrongful Conduct

Even if Essex's special relationship with WKA with regard to The Villas did not extend beyond March 2007, Essex's claim may be timely if a reasonable jury could find that WKA engaged in wrongful conduct after October 20, 2010, that was "related to" its original negligence.  For a reasonable jury to find Essex's claim timely on this basis, Essex must have presented evidence at trial sufficiently proving that "(1) [WKA] committed an initial wrong upon [Essex]; (2) [WKA] owed a continuing duty to [Essex] that was related to the alleged original wrong; and (3) [WKA] continually breached that duty." *Witt*, 252 Conn. at 370.  To toll the statute of limitations such that Essex can recover, the later wrongful conduct must have occurred no more than three years prior to its filing of this suit.  *See id.* at 369–70 ("[T]o support a finding of continuing course of conduct that may toll the statute of limitations there must be evidence of

27

the breach of a duty that remained in existence after commission of the original wrong related thereto.  That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong.").  Further, the gap in time between the initial and later wrong must not exceed the length of the limitations period, i.e., three years.  *Flannery*, 312 Conn. at 316 ("[P]ortions of such claims would be disallowed, as with any continuing tort, when the instances of wrongdoing comprising the course of conduct are separated by a gap that exceeds the length of the applicable statute of limitations.  In such cases, although the course of conduct postdating such a gap may remain actionable (so long as the action is timely commenced from the last instance of misconduct), recovery is barred for the instances of misconduct predating the gap.").

Again, a reasonable juror could conclude that Essex has satisfied the first element by proving that WKA's failure, in March of 2007, to inform Essex of Intervest's interest in The Villas constituted an "initial wrong."  Because no evidence of any "later wrongful conduct" by WKA occurring after October 20, 2010, was submitted at trial, however, Essex cannot rely on this branch of the doctrine to save its claim.

As an initial matter, the fact of WKA's "initial wrong" cannot itself produce the continued duty envisioned in this analysis:  WKA's failure to inform Essex of Intervest's interest in The Villas while it was acting as Essex's fiduciary does not itself create an indefinite duty for WKA to "right its wrong."  Otherwise, the continuing course of conduct doctrine would toll the statute of limitations in every case in which a defendant has made a negligent omission that it later fails to remedy.  *See Flannery*, 312 Conn. at 321–22 ("In the present matter, in which no continuing special relationship exists, the plaintiff essentially requests that the three year statute of limitations be tolled, indefinitely, on the basis of his former attorney's ongoing failure to

confess his earlier tortious act.  To accept this argument, however, would render the three year

statutes of limitations meaningless.") (citing *Fitzgerald v. Seamans*, 553 F.2d 220, 230 (D.C. Cir.

1977) ("[M]ere failure to right a wrong and make [the] plaintiff whole cannot be a continuing

wrong which tolls the statute of limitations, for that is the purpose of any lawsuit and the

exception would obliterate the rule.")).

No reasonable jury could conclude that WKA engaged in later wrongful conduct

adequate to save Essex's claim because there is no evidence of later wrongful conduct occurring

within the "commencement of the period allowed for bringing an action for such a wrong," *Witt*,

252 Conn. at 369–70.  The only potential "later wrong" committed by WKA was its inadequate

response to the 2009 subpoena.  A reasonable jury could find that WKA, as a result of its billing

Essex for its work in responding to the subpoena, owed Essex a duty to respond to the subpoena

adequately.  A reasonable jury could also find that WKA breached this duty because WKA

omitted a portion of its files in responding to the subpoena – namely, the Aspen File.

But no reasonable jury could find that this conduct occurred after October 20, 2010.

There was no evidence presented at trial suggesting that WKA responded to the 2009 subpoena

after October 20, 2010.  While there was evidence that WKA received the subpoena "in 2009,"

there is no evidence proving the time within that year that it was actually received.  (Verna Test.

at 28; Martin Test. at 15, 16.)  When that evidence is construed in the light most favorable to

Essex, it would permit a reasonable inference that WKA received the subpoena as late as

December 31, 2009.  To find that WKA's inadequate response to the subpoena occurred no more

than three years before filing this suit, the jury would have to infer further that WKA waited no

less than ten months and twenty-one days before submitting its response.  Put simply, such an

inference would be unreasonable.  *Cf.* Fed. R. Civ. P. 34(b)(2)(A) (requiring party responses to

document production requests to be made within 30 days); Fla. R. Civ. P. Rule 1.350(b) (same).

Essex presented no evidence suggesting that there was a delay in WKA's response to the

subpoena or that the document production was particularly lengthy or burdensome.  In fact,

Essex presented no evidence on this issue at all, and it had the burden of doing so.  *See, e.g.*,

*Flannery*, 312 Conn. at 311 n.24 ("We reject the plaintiff's contention that it was the defendant's

burden, as the party moving for summary judgment, to negate the plaintiff's allegations

regarding the applicability of the continuing course of conduct doctrine.").  As a result, no

reasonable jury could find that WKA's incomplete response to the 2009 subpoena, even if it

constituted negligence, occurred after October 20, 2010.[12]

The only other incident that Essex cites as "later wrongful conduct" – WKA's response to

the 2012 subpoena that sought Martin's deposition – cannot save Essex's claim either.  While

WKA's response to that subpoena occurred less than three years before it filed this suit, there

was no evidence presented that WKA breached any duty it owed to Essex in responding to the

2012 subpoena.  The parties do not dispute that Martin produced the Aspen File at his deposition.

Thus, even if WKA had a duty to Essex to respond adequately to the 2012 subpoena (potentially

stemming from Essex's payment of WKA to respond to the subpoena), WKA did not breach that

duty because it produced the Aspen File at that time.  As a result, no reasonable jury could

conclude Essex proved that WKA engaged in any wrongful conduct related to its original failure

to identify Intervest's mortgage on The Villas after October 20, 2010.

---

[12] Arguably, WKA also had a duty that continued throughout the pendency of the Intervest Action to
supplement its subpoena response in the event it became aware of other documents in its possession.  *Cf.
A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-cv-020 (WWE), 2014
WL 6474285, at *2 (D. Conn. Nov. 19, 2014) (recognizing a "continuing duty to supplement by
providing documents that are responsive to the discovery propounded" in response to requests for
production).  This inference, however, does not save Essex's claim because WKA did not breach that
duty.  It disclosed the Aspen File as soon as Martin came across those documents in 2012.  In any event,
Essex has not raised this argument.

While I rely on the reasoning above in concluding that no reasonable jury could conclude that WKA engaged in later wrongful conduct, I note that I am skeptical that the evidence presented at trial can satisfy this branch of the doctrine for a second reason: WKA's inadequate response to the 2009 subpoena does not appear to be a breach of a *continuing* duty that remained in existence after its original wrong in 2007.

As stated, Connecticut courts have explained that one of the elements a plaintiff must prove to invoke the "later wrongful act" branch of continuing course of conduct doctrine is that the defendant's later wrongful conduct was a breach of a "continuing duty" the defendant had to the plaintiff:

> [A] precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . . A second requirement . . . is that *there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto.* This court has held this requirement to be satisfied when there was a wrongful conduct of a defendant related to the prior act.

*Sherwood v. Danbury Hosp.*, 252 Conn. 193, 204–05 (2000) (emphasis added).  After it completed its adjusting work, WKA did not owe Essex any "continuing" duty to inform it of Intervest's interest in The Villas.  At best for Essex, receipt of the subpoena in 2009, and the agreement whereby Essex would pay WKA for responding to it, created a new duty for WKA to respond to the subpoena in a non-negligent manner.  Thus, it cannot be said that WKA owed Essex a "continuing duty" after its original negligence in 2007.

Further, the facts of this case do not square with the underlying policy goals of the continuing course of conduct doctrine, which seek to avoid forcing a plaintiff to bring an action when the wrongful conduct is still "evolving" or when the defendant's future conduct may remedy its wrong.  *See Macellaio*, 145 Conn. App. at 435 ("[T]he doctrine of continuing course of conduct as used to toll a statute of limitations is better suited to claims where the situation

31

keeps evolving after the act complained of is complete." (internal quotations and alterations omitted)); *Sanborn*, 39 Conn. App. at 295–96 ("The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." (internal quotation marks omitted)); *see also Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001) ("Not only would it be unreasonable to require [a plaintiff], as a condition of preserving his right to have a full [three] years to sue in respect of the last day on which [the unlawful conduct occurred], to bring separate suits [three] years after each of the earlier [incidents of unlawful conduct]; but it would impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them.").  WKA's post-2007 wrongful conduct only came about as a result of a fortuitous event – the service of a subpoena in 2009.  Prior to the service of that subpoena, there was no reason to think that WKA's adjustment of The Villas was still "evolving," and there was "no difficulty in identifying each wrongful act or assigning a remedy for that wrong."  *Saint Bernard Sch.*, 312 Conn. at 839.[13]  Nor was there any reason to think that the original omission would be remedied by WKA's future conduct.  While WKA's inadequate response to the 2009 subpoena arguably increased Essex's damages – by subjecting it to defense costs in the Intervest Action that might have been avoided had the schedule of mortgagees been produced in 2009 – this was a discrete injury and does not make the 2009 subpoena response part of the same course of conduct.

      I do not rely on this second ground because a dearth of analogous case law and the

---

[13] While WKA's failure to disclose the mortgagee information in its files was not a discrete act in the same way as the deposit of each check in *Saint Bernard Sch.*, it did have a discrete end point from which damages would be "readily calculable," *id.* at 838 (internal quotation marks omitted), namely, the payment of the claim check by Essex on March 19, 2007.  Once that happened, there was a discrete injury because the money had been paid to parties other than Intervest, exposing Essex to liability.

doctrine's vague terminology make it difficult to predict whether the Connecticut Supreme Court would agree that the facts of this case do not give rise to a continuing duty. Specifically, it is unclear how broadly the phrase "later wrongful conduct related to the original wrong" sweeps. *Sherwood*, one of the few Connecticut cases that examines the "later wrongful conduct" branch of the doctrine in the absence of a special relationship,[14] suggests that the phrase does not, by itself, give rise to a continuing duty, i.e., that there must be some independent evidence of a continuing duty.

There, a plaintiff brought an action against a hospital after receiving a transfusion of blood containing the human immunodeficiency virus (HIV) during a 1985 procedure. The hospital failed to inform the plaintiff that the hospital had not tested the blood for HIV despite the availability of such a test, and after learning of her infection, the plaintiff brought a negligence action against the hospital in 1996. Reversing the trial court's finding that the claim was time-barred, the Connecticut Supreme Court concluded that the hospital's failure to warn the plaintiff that the blood it used in 1985 was untested, even after the plaintiff's treatment concluded, could constitute later wrongful conduct. Citing the affidavit of a medical expert who stated that it was "good medical practice" to notify former patients that blood used in transfusions had not been tested for HIV, the court held that there was a triable issue of whether the hospital owed the plaintiff a continuing duty to warn that the blood was untested. 252 Conn.

---

[14] The court in *Sherwood* addressed the later wrongful conduct branch of the continuing course of conduct doctrine only; it did not consider whether there was a special relationship between the parties. *See* 252 Conn. at 203 n.10 ("The plaintiff argues that the continuing course of conduct doctrine is applicable in this case both because the defendant's later wrongful conduct and because of the existence of a special relationship between the plaintiff and the defendant. Because we conclude that a genuine issue of material fact exists as to whether the defendant's later wrongful conduct tolled the statute of repose, we do not consider whether a special relationship existed between the parties that could serve to toll the statute of repose.")

at 208–09.  Responding to the hospital's argument that it did not know of the plaintiff's infection until 1996, the court explained that it was not the hospital's failure to warn the plaintiff of her actual infection that breached its continuing duty, but rather the hospital's failure to later notify the plaintiff that the blood used in her transfusion had not been tested.  *Id.* at 211–12.  In other words, the hospital's lack of knowledge of the plaintiff's actual infection was irrelevant to whether it had a continuing duty to inform former patients of the general risk of infection.  The expert's affidavit provided evidence of that duty.

This case differs from *Sherwood* because no evidence was presented suggesting a similar continuing duty that existed beyond the date on which WKA completed its adjusting work on The Villas.  If, for example, there had been evidence showing that in the adjusting industry it was common practice to warn insurer clients about the possibility that the adjuster might have missed the existence of a mortgagee, or that WKA had, after 2007, come across a reason to become concerned that it was wrong about there being no mortgagee, *Sherwood* might suggest that there was a continuing duty to warn Essex of that chance.[15]  But Essex presented no such evidence at trial.  It appears, then, that no reasonable jury could find that WKA owed a duty to Essex that continued after 2007.  Nonetheless, because the doctrine is far from clear on this issue, and because it is clear that no reasonable jury could find that WKA's response to the 2009 subpoena occurred after October 20, 2010, I rely on the timing issue in deciding that WKA failed to establish the later wrongful conduct branch of the doctrine.

---

[15] It also might not:  In *Sherwood*, recognizing a continuing duty to warn served the goal of mitigating harm by increasing the likelihood that an infection would be discovered before it could inflict greater harm.  The same cannot be said here.  Imposing a continuous duty on WKA to check its files and correct its inadvertent omission would not have spared Essex the full $1 million in damages to which it became exposed after issuing the claim payment without communicating with Intervest in March 2007.  The fact that Essex incurred an additional but discrete injury from a later wrong – the inadequate 2009 subpoena response – does not provide a basis for making WKA's original duty to check its files a continuing one.

In sum, there is no evidence that, at any time after October 20, 2010, WKA engaged in wrongful conduct that was related to its initial wrong of failing to identify Intervest's interest in The Villas to Essex in 2007.  As a result, a reasonable jury could not find Essex's claim timely on that basis.

### C.  Equitable Tolling

In its response memorandum, Essex also argues that equitable tolling renders its negligence claim timely.  (Pl.'s Mem. Opp., ECF No. 79, at 19–20.)  Essex did not request that this Court instruct the jury on the doctrine of equitable tolling (s*ee* Pl.'s Proposed Jury Instructions, ECF Nos. 49, 52, 55), nor did it raise the issue at the charge conference.  *Cf.* Fed. R. Civ. P. 51(d)(1)(B) ("A party may assign as error . . . a failure to give an instruction, *if that party properly requested it and . . . also properly objected*." (emphasis added)).  No equitable tolling issue was submitted to the jury.

I also note that, under Connecticut law, equitable tolling does not apply to a statute of repose such as Section 52-577.  *See Gerena v. Korb*, 617 F.3d 197, 206 (2d Cir. 2010) ("[T]he possibility that equitable tolling might apply here is foreclosed by Connecticut precedent, which establishes Conn. Gen. Stat. § 52-577 as a statute of repose not susceptible to equitable tolling." (citing *Carter v. Univ. of Conn.*, No. 3:04-cv-1625 (SRU), 2006 WL 2130730, at *3 (D. Conn. July 28, 2006) ("Section 52-577 . . . has apparently never been held by an appellate court of Connecticut to be subject to the doctrine of equitable tolling.  Instead, section 52-577 has been labeled a statute of repose, which sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues." (footnote and internal quotation marks omitted))); *Conn. Ins. Guar. Ass'n v. Yocum*, No. CV-94-0539691-S, 1996 WL 367726, at *5 (Conn. Super. Ct. June 6, 1996) ("[T]he doctrine of equitable tolling cannot be

invoked to avoid the applicability of the time bar here at issue, which is a statute of repose, not a statute of limitations."); *Saperstein v. Danbury Hosp.*, 2010 WL 760402, at *13 (Conn. Super. Ct. Jan. 27, 2010) ("[T]he law is well established that equitable tolling does not apply to statutes of repose."); *Crow & Sutton Assocs., Inc. v. C.R. Klewin Ne., LLC*, No. HHDX04-CV-05-4016823-S, 2009 WL 1057977, at *4 (Conn. Super. Ct. March 26, 2009) ("This court agrees with the analyses of Judges Sheldon and Covello, which found that the doctrine of equitable tolling is inapplicable to a statute of repose, such as § 52-577.").

Essex asserts that, as identified in *Int'l Strategies Group, Ltd. v. Ness*, the Second Circuit's statement on this issue in *Gerena* was only dicta.  645 F.3d 178, 185 (2d Cir. 2011) ("Ness cites our dicta concerning the unavailability of equitable tolling under [Section] 52-577 . . .").  But the *Int'l Strategies Group* court did not disagree with the proposition that equitable tolling could not be applied to a statute of repose, nor did it point to any Connecticut cases that have since held that equitable tolling may apply to Section 52-577.  Rather, it only explained that *Gerena*'s statement regarding equitable tolling did not extend to preclude the applicability of equitable *estoppel*. *Id.* ("[Ness's] argument [based on *Gerena*] ignores the differences between equitable tolling and equitable estoppel.").  The Court has not been able to find a single Connecticut case suggesting that equitable tolling may be applied to Section 52-577, and Essex has made no argument that the separate doctrine of equitable estoppel applies here.

Because Essex failed to request an instruction on equitable tolling, and because it cannot be applied to Section 52-577, Essex's equitable tolling argument fails.

### IV.    Conclusion

Based on the evidence presented at trial – construed in the light most favorable to Essex and drawing all reasonable inferences in its favor – no reasonable jury could find Essex's

negligence claim against WKA to be timely.  The claim is time-barred because the negligent

omission Essex identified at trial occurred more than three years before Essex brought this suit,

and no evidence was submitted proving either (1) a special relationship relating to The Villas

that existed in 2007 and continued to exist after October 20, 2010, or (2) that WKA engaged in

related wrongful conduct after October 20, 2010.  WKA is entitled to judgment as a matter of

law.  Its renewed motion for judgment as a matter of law (ECF No. 66) is GRANTED, and its

original motion for judgment as a matter of law (ECF No. 62) is DENIED as moot.  The Clerk is

directed to enter judgment in favor of WKA.


IT IS SO ORDERED.

                                          /s/
                                   _____
                                   Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                May 19, 2016